**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **NO. 1:11-CR-142(5)** |
| | § | |
| **ADRIENNE SHIREE COLEMAN** | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE
JUDGE ON THE DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE**

Pending is "Defendant Adrienne Shiree Coleman's [Amended] Motion to Suppress Evidence" (Dkt. 134)[1], seeking suppression of her traffic stop, arrest, search and all fruits resulting from the traffic stop, including but not limited to a video recording of the stop, contraband seized in the amount of 5 kilograms of cocaine, and statements made during her detention. Coleman seeks relief pursuant to the Fourth Amendment of the United States Constitution. The United States filed a sealed response in opposition to the motion (Dkt. 143), and the undersigned magistrate judge heard testimony and oral argument on June 13-14, 2012.

The undersigned finds the traffic stop and detention of Coleman unlawful because Trooper Norsworthy lacked the requisite reasonable suspicion that Coleman committed a traffic violation.

**I. DISCUSSION**

The "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST., Amdt. 4. A seizure of a person has been identified as occurring at that point in time when, "in view of all of the

---

[1] This motion is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law. United States v. Raddatz, 447 U.S. 667, 681-84 (1980); see also 28 U.S.C. § 636(b)(1)(B) and Local Rules for the Assignment of Duties to United States Magistrate Judge.

circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). A traffic stop entails a seizure for purposes of the Fourth Amendment. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (stopping a vehicle and detaining its occupant(s) constitutes a seizure). As such, the question for this Court is whether the stop was unreasonable.

### A. Facts of the Initial Stop

On Thursday, March 31, 2011, Texas Department of Public Safety Trooper Thomas Norsworthy encountered Coleman driving a maroon Lexus four door passenger vehicle traveling east on Interstate 10 between Houston and Beaumont, Texas. (Tr. 24-28.) Trooper Norsworthy testified that he stopped Coleman for impeding traffic in violation of TEX. TRANSP. CODE § 545.363, specifically that he witnessed Coleman (upon sight of his stationary vehicle) slam her brakes so hard that the front end of her car dipped, causing traffic to back up around her. (Tr. 28-30, 34.) (This incident was not documented by his video recorder.) Trooper Norsworthy testified that there were normal traffic conditions on the day of the alleged offense, and that based upon his "visual estimation," she abruptly decelerated to 50 - 55 mph causing other vehicles to slow down and stack up behind her. (Tr. 27, 29, 32, 34.)

After witnessing the incident, Trooper Norsworthy proceeded approximately four (4) miles to catch up to Coleman who was driving 65 mph (the speed limit) and keeping with the flow of traffic. (Tr. 39-41.) Trooper Norsworthy stated that after he got into the center lane behind Coleman, she slowed to a speed of 63 mph causing an 18 wheeler to pass on the right and causing other traffic to slow down. (Id.)

The video begins with Trooper Norsworthy reporting through his police radio that Coleman

was "impeding traffic in the center lane" while an 18 wheeler passes Coleman on the right. (Def. Ex. 1.) Coleman's vehicle and the 18 wheeler are the only vehicles seen in the video. (Id.) After Coleman stops her vehicle on the right shoulder of the road, Trooper Norsworthy approaches on the passenger side and says, "the reason you were stopped is you were only doing 63 miles an hour, the speed limit around here is 65, okay? If you are gonna do that, you can do it, but you need to be in the right lane because what you do is - you are impeding traffic. You see how that 18 wheeler had to pass you in the right lane?" (Id.) Trooper Norsworthy testified at the hearing that he issued a warning citation to Coleman for impeding traffic by traveling 63 mph in a zone with a 65 mph speed limit. (Tr. 43, 61, 110.) The parties also stipulated at the hearing that the minimum speed limit for the area was 45 mph. (Tr. 9.)

### B. Legality of the Stop

Coleman claims that there was no probable cause or reasonable suspicion to stop her vehicle, and that the stop amounted to nothing more than a pre-text stop. While courts will not examine a police officer's subjective motive for making a traffic stop, the traffic stop must nonetheless result from probable cause or reasonable suspicion to believe that Coleman has at least violated some traffic regulation. United States v. Granado, 302 F.3d 421 (5th Cir. 2002). Even a minor violation can justify a traffic stop. See, e.g. United States v. Zamora, 2011 WL 4953992, at *4 (5th Cir. October 19, 2011) (holding that a missing front license plate and cancelled rear license plate provides police with reasonable suspicion); United States v. Summers, 108 Fed. Appx. 192 (5th Cir. 2004) (holding that the district court did not err in holding a traffic stop was justified by believing the testimony of the arresting officer who stopped the vehicle because of the driver's failure to signal before turning). Traffic stops, whether supported by probable cause or a reasonable suspicion, are

treated as <u>Terry</u> stops. <u>Brigham</u>, 382 F.3d at 506. A <u>Terry</u> stop refers to the Supreme Court's decision in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), which holds that courts must apply a two-step reasonable suspicion inquiry to:

1) determine whether the officer's action was justified at its inception, and

2) determine whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.

<u>United States v. Zamora</u>, 2011 WL 4953992, at *4 (5th Cir. October 19, 2011). The government bears the burden of establishing by a preponderance of the evidence the two elements under <u>Terry</u>. <u>United States v. McMahan</u>, 2007 WL 2470999, *4 (N. D. Tex. August 30, 2007) (<u>citing</u> <u>United States v. Sanchez-Pena</u>, 336 F.3d 431, 437 (5th Cir. 2003)); <u>see also</u> <u>United States v. Waldrop</u>, 404 F.3d 365, 368 (5th Cir. 2005). With regard to the first element, the officer must have reasonable suspicion to justify the stop, in view of the totality of the circumstances; meaning, he must have a particularized and objective basis for suspecting legal wrongdoing. <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002).

Trooper Norsworthy stopped Coleman for a violation of Transp. Code § 545.363(a) (1995), which states:

> Sec. 545.363. MINIMUM SPEED REGULATIONS. (a) An operator may not drive so slowly as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with law.

The Court must determine whether, objectively, Trooper Norsworthy had a reasonable suspicion that some sort of illegal activity, in this instance a violation of Texas's minimum-speed regulations, occurred or was about to occur, before stopping Coleman's vehicle. <u>See</u> <u>United States v. Coronado</u>, 480 F. Supp. 2d 923, 927 (W.D. Tex. 2007) <u>citing</u> <u>Lopez-Moreno</u>, 420 F.3d at 430; <u>see also</u> <u>Whren</u>,

517 U.S. at 809-10, 116 S.Ct. 1769.

The evidence presented at the hearing shows that Coleman was stopped for traveling only 2 mph under the speed limit, which is well above the speed minimum of 45 mph and only slightly below the maximum. This behavior, even if considered an impediment to traffic, is allowed under the above-cited statute in order for a person to comply with the law - "except when reduced speed is necessary for safe operation *or in compliance with law*." See TRANSP. CODE § 545.363(a) (1995) (emphasis added). According to a simple reading of § 545.363(a), Coleman had every right to impede the normal movement of traffic if her speed was in compliance with the law. In this case, all of the evidence shows that Coleman was operating her vehicle within the minimum and maximum speed limits.

Moreover, Trooper Norsworthy testified that there were normal traffic conditions and only one vehicle was in the process of passing Coleman. (Tr.27, 40.) The video shows only one vehicle driving alongside Coleman and no traffic congestion. (Def. Ex 1.) Trooper Norsworthy's testimony- raised for the first time at the suppression hearing - that Coleman was initially traveling at 50-55 mph based upon his "visual estimation" causing other vehicles to slow down behind her (Tr. 32-34, 152.) also does not rise to the level of reasonable suspicion that Coleman was impeding traffic for the short amount of time that the Trooper observed that behavior and the normal traffic conditions on that day. The undersigned also questions the credibility of the Trooper's statement given its timeliness, his demeanor, and the lack of corroboration with the rest of the evidence.

A vehicle that is approached by a law enforcement vehicle can slow down without raising an objectively reasonable suspicion that a traffic violation occurred. See e.g., United States v. Coronado, 480 F.Supp.2d 923, 927–29 (W. D. Tex. 2007) (government failed to show that

5

reasonable suspicion existed where defendant was traveling 53 miles per hour in the left lane where the speed limit was 65 miles per hour, and officer testified that there were ten to fifteen cars behind the defendant's car but did not testify as to how long he observed the backup of vehicles); Delafuente v. State, 2012 WL 1087375, *3-4 (Tex. App. – Houston [14 Dist.] April 3, 2012) (government did not meet burden of reasonable suspicion where the officer's offense report merely stated that the traffic volume was moderate, that there was congestion in the left lane, and that appellant's vehicle was traveling 13 miles per hour below the speed limit while the officer was following it because the report lacked specific, articulable facts to substantiate it); Tex. Dep't of Pub. Safety v. Gonzales, 276 S.W.3d 88, 93-95 (Tex. App. - San Antonio 2008, no pet.) (no reasonable suspicion existed where defendant was traveling 45 miles per hour in a 65 mile-per-hour zone—which the officer "considered impeding traffic"—and the officer could not recall the amount of traffic on the highway. The court stated, "[a]n officer's conclusory statement that the law has been violated is not sufficient to prove reasonable suspicion."); Richardson v. State, 39 S.W.3d 634, 636–39 (Tex. App.-Amarillo 2000, no pet.) (no reasonable suspicion existed where defendant was traveling 45 miles per hour in the right-hand lane, only one vehicle passed defendant, there was little or no traffic for defendant to impede, and defendant slowly increased his speed to 57 miles per hour).

Accordingly, the undersigned finds that Trooper Norsworthy did not have reasonable suspicion or probable cause that Coleman's vehicle was impeding the normal and reasonable movement of traffic. Having objectively determined that the traffic stop was not based on a reasonable suspicion, the arrest of Coleman and evidence obtained as a result of that stop must be excluded. See Weeks v. United States, 232 U.S. 383, 398 (1914).

## C.     Facts of the Detention[2]

The video recording shows that Coleman was pulled over by Trooper Norsworthy at 7:47 a.m.[3]  (Def. Ex 1.)  Once Coleman drove her Lexus to the right shoulder of Interstate 10 East, Trooper Norsworthy approached the passenger side and retrieved Coleman's identification and insurance information.  (Id.)  Soon thereafter, Trooper Norsworthy asked Coleman to step to the back of her vehicle.  (Id.)  Before exiting, Coleman told the Trooper that she was a Mississippi police officer and responded negatively when asked if she had her gun.  (Id.)  When Trooper Norsworthy asked about her travels, Coleman stated that she came to Houston on Tuesday to visit friends and family and also to apply for employment at the Harris County Sheriff's Office and possibly with Beaumont law enforcement.  (Id.)  Trooper Norsworthy then questioned her about illegal contraband, including drugs, and Coleman denied the presence of anything illegal.  (Id.)  He then notified Coleman that he would give her a warning and returned to his vehicle at 7:54 a.m. to initiate a series of computer background checks concerning the vehicle, outstanding warrants, and criminal history.  (Id.)  Trooper Norsworthy indicated in his offense report that he believed Coleman was being dishonest and that a crime was taking place due to her nervousness and the fact that she was traveling on a known drug corridor.[4]  (Def. Ex. 2, p. 3.)

At 8:00 a.m., Trooper Norsworthy requested permission to search Coleman's vehicle, which she initially refused.  (Def. Ex 1.)  He testified that her refusal further indicated to him that she was

---

[2]  Although the undersigned concluded that the stop of Coleman was not justified, the second stop of the Terry analysis -  the legality of Coleman's detention - will also be discussed.

[3]  Trooper Norsworthy testified that his video camera was one hour and five  minutes behind because it was not adjusted for daylight savings time.  (Tr. 157.)  However, for ease of pinpointing the time and location of each event on the exhibit, the undersigned will use the time stamp on the camera recording.

[4]  Trooper Norsworthy testified that he had, at the time of the suppression hearing, about two and a half years of experience as a Trooper with the Texas Department of Public Safety.  (Tr. 18.)

involved in some sort of criminal activity.  (Id.)  He returned to his vehicle, and at 8:04 a.m., called Texas Department of Public Safety Trooper Brigitte Hazelton, a dog handler with the canine unit, to perform a search of the air around Coleman's vehicle for suspected narcotics.  (Id.)  During his conversation with Trooper Hazelton, he stated that Coleman was a police officer, a single black female, and then stated three times that he had a "weird vibe" about her.  (Id.)

Trooper Norsworthy then got out of the car and returned to Coleman with what appeared to be her driver's license and told her that he called out the canine unit so they would be waiting awhile.  (Id.)  At 8:07 a.m., Coleman gave consent to search her vehicle.  (Id.)  Trooper Norsworthy continued to question Coleman about why she did not have her handgun with her, and she stated that she did not bring it with her because she flew into Texas "Tues...Wednesday, yesterday."[5]  (Id.) Trooper Norsworthy then questioned her further regarding her trip, and she stated that she flew to Houston because her car was being repaired there by someone her aunt knew since it was less expensive there than the repair shops and dealership in Mississippi.  (Id.)  She also stated that she was going to have to bring it back again because the odometer was still not working.  (Id.)  Trooper Norsworthy stated in his offense report that this did not make financial sense to him, and the waffling on her arrival date added to his suspicion that criminal activity was afoot.  (Def. Ex. 2, p. 5.)

After getting Coleman's social security number, Trooper Norsworthy returned to his vehicle and called to verify her employment with the Jackson, Mississippi Police Department.  (Def. Ex 1.) At 8:16 a.m., he confirmed Coleman's employment.  (Id.)  He testified that he knew by this time that all of the computer checks on Coleman were normal and her criminal history check was clear.

---

[5]  The stop occurred on a Thursday.  (Tr. 27.)

(Tr. 75, 206-207, 211.)  He also called Trooper Hazelton to let her know that Coleman consented to a search, but told her that he would text her to call her off if Coleman signed the written waiver and allowed the search.[6]  (Def. Ex. 1.)  At 8:19 a.m., Trooper Norsworthy exited his vehicle and the audio on his uniform video recorder went out; however, he testified that Coleman withdrew her consent at that time.  (Tr. 74.)  He also testified that it was at this time that the "normal" stop of Coleman was concluded.  (Tr. 75, 138.)  From this point, it *took an additional 43 minutes* (9:03 a.m.) for the dog free air search to begin.  (Def. Ex. 1.)  During this wait, several other troopers arrived at the scene and questioned Coleman.  (Id.)  None of these troopers testified at the hearing.  Trooper Norsworthy continued to express to the other troopers as they arrived that he had a "weird vibe" about Coleman.  (Id.)  He also stated to another officer, "[w]hat got me was she said, 'I don't smoke'" when he questioned her as to whether she had marijuana in the vehicle.  (Id.)  At 9:06 a.m., Trooper Hazelton indicated that the dog alerted, and the physical search of the vehicle began.  (Id.)

## D.     Legality of the Detention

Coleman claims that her detention was the result of an unlawful and overreaching search, which exceeded the scope of the alleged purpose of the stop and lacked the required reasonable suspicion and probable cause for the seizure, making the continued detention unreasonable and, consequently, unlawful.  (Dkt. 134, p. 4-5; Dkt. 148, p. 5-11.)

The second prong of the Terry analysis requires that the detention last no longer than required to effectuate the purpose of the stop - the purpose of the stop in the instant case was the suspected violation of a misdemeanor traffic violation, which in the undersigned's opinion never

---

[6]  Trooper Norsworthy was waiting for a return on Coleman's criminal history when she temporarily gave consent to search her vehicle (only to revoke it minutes later), during which Trooper Hazelton continued en route to Coleman's vehicle.  Thus, Coleman's consent to search the vehicle did not alter the timetable of her detention.

occurred. See United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005) (quoting Brigham, 382 F.3d at 507 (5th Cir. 2005)). In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check to investigate whether the driver has any outstanding warrants or if the vehicle is stolen. Brigham, 382 F.3d at 507. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. These types of questions are acceptable for a traffic stop as long as they do not unnecessarily prolong the detention. Id. Normally, once the computer check comes back clean, any continued questioning thereafter unconstitutionally prolongs the detention.[7] United States v. Pack, 612 F.3d 341, 361 (5th Cir. 2010); United States v. Dortch, 199 F.3d 193, 199 (5th Cir. 1999). If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. See Brigham, 382 F.3d at 510. The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on *more than an unparticularized suspicion or hunch*. United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000) (emphasis added). Essentially, the government must show that: "(1) the facts that emerge during the police officer's investigation of the original offense create reasonable suspicion that additional criminal activity warranting additional present investigation is afoot, (2) the length of the *entire* detention is reasonable in light of the suspicious facts, and (3) the scope of the additional investigation is reasonable in light of the suspicious facts, meaning that it is reasonable to believe that each crime investigated, if established, would likely explain the suspicious facts that gave rise to the reasonable suspicion of criminal activity." United States v. Pack, 612 F.3d

---

[7] The undersigned notes that this holding makes no mention of the justification of an officer in checking a detainee's employment and criminal history, which Trooper Norsworthy did in this case, prolonging the stop even more.

at 358 (emphasis added). As such, in order for the detention to have been legal, the facts articulated as the basis for the Trooper's suspicion that criminal activity was afoot had to have been observed by the time all of the routine checks were done and must be sufficient to make his suspicion of criminal activity reasonable. Id. at 361.

In this instance, Trooper Norsworthy testified that the following factors contributed to his reasonable suspicion that Coleman was committing a crime: Interstate 10 is a known drug corridor; Coleman acted nervously several times; she gave him a "weird vibe"; she stated "I don't smoke"; refused consent for him to search the vehicle; and her date of arrival was inconsistent since she initially said she flew into Houston on Wednesday as opposed to Tuesday. (Tr. 50, 56, 58-59, 61, 63-65, 70, 80-81, 136, 161-162; Def. Ex. 1.) As explained below, those observations do not establish the reasonable suspicion necessary to warrant her continued detention after it was verified that her vehicle was not stolen and there were no outstanding warrants for her arrest.

Coleman's nervousness is not at all apparent on the video recording admitted into evidence. (Def. Ex. 1.) Moreover, nervousness, standing alone, generally is not sufficient to support reasonable suspicion. See United States v. Santiago, 310 F.3d 336, 342 (5th Cir. 2002); see also United States v. Beck, 140 F.3d 1129, 1138 (8th Cir. 1998) ("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer."); United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer").

A "weird vibe" is akin to a "hunch," which the Fifth Circuit has held does not amount to reasonable suspicion. See Jones, *supra.* In addition, "[t]he mere fact that a person refuses to consent

to search cannot be used as evidence in support of reasonable suspicion." United States v. Machuca-Barrera, 261 F.3d 425, 435 (5th Cir. 2001). The audio from the video recording is unclear as to whether Coleman said "I don't smoke," but she also stated "no, nothing" in response to his questions about illegal narcotics in her vehicle. (Def. Ex. 1.) Lastly, her story that she flew in Wednesday instead of Tuesday can be reconciled with her previous statement because she states "Tues...Wednesday, yesterday. . ." (Id.) The financial aspect of her story is questionable, but does not rise to the level of reasonable suspicion of criminal activity given the surrounding circumstances: she bought the car in Houston recently, was looking for employment there (where her family lived), and was an active police officer with no criminal history. (Def. Ex. 1.)

In United States v. Pack, the Fifth Circuit discussed several cases regarding inconsistent stories given during a traffic stop and found that each one involved minor and insignificant inconsistencies that were reconcilable and did not rise to any reasonable suspicion of criminal activity.[8] United States v. Pack, 612 F.3d 341, 359-361 (5th Cir. 2010) (citing United States v. Jones, 234 F.3d 234 (5th Cir. 2000); United States v. Santiago, 310 F.3d 336 (5th Cir. 2002); United States v. Estrada, 459 F.3d 627 (5th Cir. 2006)).

In Jones, the driver of the stopped vehicle indicated that his passenger was his uncle and that they were going to Memphis for "a couple of weeks" to do some work for "Street Institute Records." Pack, 612 F.3d at 359. In response to similar questioning, the passenger indicated that the driver was his son-in-law's brother and that they were going to Memphis for "about a week" to promote an album produced by "Sage Stone Entertainment." Id. The court noted that "[i]t made sense that

---

[8] Portions of the three cases cited follow the holding in United States v. Dortch, 199 F.3d 193 (5th Cir. 1999) that an officer must have reasonable suspicion of a "particular crime," which the Fifth Circuit later abrogated in United States v. Brigham, supra; however, the Fifth Circuit in Pack still finds the inconsistent statements used in those cases lack reasonable suspicion, so they are discussed here for reference in analyzing this case.

a person might refer to his brother's father-in-law as an uncle. It also made sense that two studios would collaborate on the same album. The discrepancy in the amount of time the two planned to be in Memphis might have resulted from a misunderstanding, from the fact that they had not set a firm schedule, or from the fact that the actual time was something like ten days." Id.

In Santiago, the defendant indicated that the woman and two children in the vehicle were his wife and children. Id. When he was confronted with the fact that his name was listed on the vehicle's registration along with the name of a different woman, the defendant looked extremely surprised and attempted to convince the police that the passenger was his ex-wife and that the woman on the vehicle's registration was his current wife. Id. at 359-360. The defendant claimed that they were going to Atlanta for a week, while the woman in the vehicle claimed that they were going to Atlanta for two or three weeks. Id. at 360. The vehicle had California license plates and was stopped in Louisiana. Id. The Pack court noted that "[w]hile the inconsistencies in Santiago were more serious than those in Jones, they were still reasonably reconcilable. It was possible that the defendant was telling the truth about the identity of the woman in his car. It was also possible that the discrepancy in the group's travel dates was due to a miscommunication or due to the woman including the driving time from California to Atlanta in her estimate of how long the group would be 'in Atlanta.'" Id.

In Estrada, the owner of the stopped vehicle stated that he had bought the vehicle a month before the stop occurred, and the owner's brother said he thought the owner had bought it three months before the stop. Id. The Pack court stated that it was entirely reasonable for someone who did not own the vehicle not to know when his brother had bought it. Id.

In comparing these three cases to its own, the Pack court found that the "the inconsistencies

between Pack's and Williamson's stories were neither reconcilable nor minor. Among other things, the two could not agree on which major city (many miles apart) they had spent the last several days visiting or whom they had visited there. ...[T]heir stories were 'completely different.'" Id.

In the instant case, Coleman's inconsistency is even more minor than the above cases, and given the totality of the circumstances, does not constitute reasonable suspicion to prolong the continued detention. There are an infinite number of reasonable explanations, unrelated to any criminal behavior, to explain why travelers would travel on I-10 and be nervous when stopped by the police.

### E.  Exclusionary Rule

The exclusionary rule is a jurisprudential construct designed for the purpose of deterring "future unlawful police conduct and thereby effectuat[ing] the guarantee of the Fourth Amendment against unreasonable searches and seizures[.]" United States v. Calandra, 414 U.S. 338, 347 (1974). Under the exclusionary rule, which "was adopted to effectuate the Fourth Amendment right of all citizens, ... evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." Id. The rule excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence, or "fruit of the poisonous tree." Segura v. United States, 468 U.S. 796, 804 (1984). The undersigned has already found that the police conduct in this case violated Coleman's Fourth Amendment rights. The invocation of the exclusionary rule, in this case, would serve its intended purpose in deterring similar police conduct; therefore, all evidence obtained as a result of the illegal search and seizure should be suppressed. This should include: the traffic stop; video recording of Coleman; statements by Coleman during the stop and after her arrest; the arrest; all items seized

14

from Coleman's vehicle, including but not limited to the 5 kilograms of cocaine seized; the Defendant's vehicle; any photographs relating to the traffic stop, including photographs of Coleman taken at the stop or taken as a result of her arrest, photographs of the scene at the traffic stop, or photographs of Coleman's vehicle; the offense report and any supplements or amendments; any testimony from an officer regarding the traffic stop or search and seizure of Coleman's vehicle and the 5 kilograms of cocaine found, including Trooper Thomas Norsworthy, Trooper Dustin Blackburn, Trooper Danielle Douglas, Trooper Brigitte Hazelton, Trooper Orlando Jacobs, and Agent Brian Nichols.

At the hearing, the Government proffered testimony from DEA Agent Hartsock indicating that there is other evidence concerning Coleman's involvement in the conspiracy alleged in the superseding indictment that was not procured as a result of Coleman's unconstitutional detention. (Tr. 265-366.)  The undersigned agrees that evidence (including the possible testimony of cooperating co-conspirators), apart from the above-stated suppressed evidence, was not obtained as a result of the traffic stop made by Trooper Norsworthy.  Therefore, it is not suppressed under the exclusionary rule because it is not reached by the exclusionary rule - not because of any exceptions to the exclusionary rule as argued by the Government in its Response to Coleman's Motion to Suppress.

### F.      Government's Motion to Strike

The Government moves to strike in part Coleman's Motion to Suppress to the extent that it seeks to suppress the identity of Coleman for alleged Department of Justice policy violations relating to witness identification.  (Dkt. 143, p. 19-21.)  The Government alleges that Coleman's motion is devoid of specificity as to this issue and is not recognized by case law.  (Id.)  It is recommended that

the Government's Motion to Strike in part on this issue is granted.

## II.  RECOMMENDATION

The district court should find that the stop and subsequent search and detention of Coleman violated the Fourth Amendment of the United States Constitution.  Accordingly, the Defendant's Amended Motion to Suppress and the Government's Motion to Strike in Part should be granted as stated above.  However, the district court should not suppress the evidence obtained by the DEA in the separate, independent investigation of Coleman for illicit drug trafficking as alleged in the Superseding Indictment.

## III.  OBJECTIONS

Objections must be:  (1) specific, (2) in writing, and (3) served and filed within fourteen (14) days after being served with a copy of this report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b), and 72(b).  A party's failure to object bars that party from:  (1) entitlement to de novo review by a district judge of proposed findings and recommendations, see Rodriguez v. Bowen, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error of unobjected-to factual findings and legal conclusions accepted by the district court, see Douglass v. United Servs. Auto. Ass'n., 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).  The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly

adopting the magistrate's report and recommendation. <u>See</u> <u>Hernandez v. Estelle</u>, 711 F.2d 619, 620 (5th Cir. 1983); <u>United States v. Elsoffer</u>, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

SIGNED this 10th day of July, 2012.

_____
Zack Hawthorn
United States Magistrate Judge